**IN THE COURT OF APPEALS OF TENNESSEE**
**AT NASHVILLE**



**FILED**

**December 3, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE | ) | CANNON COUNTY |
| DEPARTMENT OF CHILDREN'S | ) | |
| SERVICES, | ) | NO.  01A01-9806-JV-00275 |
| | ) | |
| Petitioner/Appellee | ) | HON.  JOHN B. MELTON, III |
| | ) | JUDGE |
| v. | ) | |
| | ) | |
| TAMRA LEEANN VIAR, | ) | |
| | ) | |
| Respondent/Appellant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN FITZGERALD GROSS, | ) | |
| (Present Whereabouts Unknown), | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE UNKNOWN FATHER OF | ) | |
| KATELYN NICOLE VIAR, | ) | |
| (Present Whereabouts Unknown), | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| IN THE MATTER OF: | ) | |
| KATELYN NICOLE VIAR | ) | REVERSED |
| d/o/b:  9/22/95 | ) | |

J. Brooks Fox, Tullahoma, for Appellant Tamra Leann Viar.
John Knox Walkup, Attorney General, and Douglas Earl Dimond, Assistant
Attorney General, Nashville, for the Appellee DHS.

---

**O P I N I O N**

INMAN, Senior Judge

The parental relationship between Tamra Viar and her daughter, Katelyn,

was terminated by the Juvenile Court, the propriety of which she presents for

review.  Our review of the findings of fact made by the trial Court is *de novo* upon

the record of the trial Court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. TENN. R. APP. P., RULE 13(d); *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26 (Tenn. 1996).

Ms. Viar was born August 22, 1978. She was brought into State custody on December 10, 1991, at age thirteen, when her parents surrendered their parental rights. She was placed in full guardianship of the Department of Human Services.

While in State custody, Tamra gave birth to Katelyn on September 22, 1995. A petition was immediately filed by a DCS foster care counselor seeking custody of Katelyn as a dependent and neglected child, alleging that Ms. Viar was unable to care for her. The Juvenile Court granted custody of Katelyn to DCS upon a finding that she was subjected to an immediate threat likely to result in severe and irreparable harm.

Ms. Viar suffered emotional problems, possibly from birth. From November 1992 until September 1995, a seemingly chronic anger posed serious problems for her; she was placed in three foster homes but was removed from each because of her violent acts. She assaulted her third foster mother, for which she was committed to the Department of Mental Health and Mental Retardation. After three months she was returned to DCS custody and enrolled in Holston Point, an in-patient treatment facility. Following treatment, she was enrolled in Chance, a Level II residential treatment facility. She fled Chance, and later returned pregnant with her daughter.

The counselors found a therapeutic placement for Ms. Viar and Katelyn through the American Family Institute in Chattanooga. Ms. Viar continued her violent behavior, assaulting the foster mother on more than one occasion. She was again convicted of assault and placed on probation.

Finally, Ms. Viar and Katelyn were placed in therapeutic foster care in the Reeder home, with a plan of care. Her behavior was intermittently good and bad. Medications - Depakote and Navane - had been prescribed for her to control her violence. Although Ms. Viar was admittedly aware of the need to take these medications, she frequently refused to do so; although she agreed that she needed mental health counseling, she broke off a treatment schedule with four counselors, one of whom, Dr. Hood, described her as "manipulative, dishonest and rationalized all her actions so as to perceive herself as blameless."

On April 29, 1997, the DCS filed a petition against Tamra, John F. Gross and the unknown father of Katelyn to terminate parental rights. Gross was named as Katelyn's father by Tamra, but his whereabouts have never been discovered.

The petition alleged that Tamra abandoned her child, citing T.C.A. § 36-1-113(g)(3)(A) *et seq.,* and that the conditions which led to the removal of Katelyn from her mother would persist, subjecting the child to further abuse and eventually diminishing the opportunity to be integrated into a permanent home.

Tamra filed a response and counter-petition, and denied that she abandoned her child. She alleged that she was now of legal age, employed full time at Wal-Mart, and well able to rear her child, whose custody she sought.

A plenary trial resulted in a judgment terminating the parental rights of Tamra, upon a finding that she had abandoned her child within the purview of T.C.A. § 36-1-113(g)(3)(A) in that the child had been removed from her custody for longer than six months with the conditions leading to the removal still persisting. The Court found that the plan of care was not followed by Tamra, that she unilaterally terminated her counseling, and that Katelyn would continue to be neglected and abused.

On appeal, Tamra argues that all of the evidence presented by DCS focused on a violation of T.C.A. § 36-1-113(g)(2), i.e., that she had not complied with the statement of responsibilities in the plan of care, but that the Petition to Terminate Parental Rights does not allege such violation. Rather, Tamra argues the petition alleged only one ground, that being T.C.A. § 36-1-113(g)(3)(A), which she insists is a different and distinct grounds for termination, thereby activating Rule 39(a)(6) of the Tennessee Rules of Juvenile Procedure which requires the petition to set forth facts which are sufficient to warrant a determination that one or more of the grounds for terminating parental rights exist as provided in [T.C.A. § 36-1-113(g)(2)].

T.C.A. § 36-1-113(g)(3)(A) provides that termination may be based on the ground that the child has been removed from the home of the parent or guardian by order of a Court for a period of six months and

> (I) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's return to the care of the parent(s) or guardian(s) still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

The Juvenile Court found that all of the statutory conditions existed and ordered termination, as stated.

T.C.A. § 36-1-113(g)(2) provides that termination of parental rights may be based on the ground that there has been substantial noncompliance by the parent with the statement of responsibilities in a plan of care, pursuant to T.C.A. § 37-2-401 *et seq.* This latter statute provides for foster care, and if the parent does not

4

substantially comply with the plan of care, the Court is authorized to terminate the relationship.

The testimony fairly detailed most of Tamra's life from the time she was thirteen years old when her parents consented to the termination of their parental rights to the time of trial of this case on December 2, 1997. Issues of her abiding anger accompanied by violence, assaults on foster parents, instability, neglect of Katelyn, lack of ability to parent, irresponsibility, refusal to cooperate, and the like were graphically described by various witnesses. All in all, a gloomy picture of Tamra appeared, with little or no hope that Katelyn's future would be any better.

Tamra testified that she now resides in Illinois so "I could get my feet on the ground;" that she completed her GED; that she was learning nonmedical ways to control her temper; that her distrust of the State continues; that she works at Wal-Mart, and is able to care for Katelyn in a proper way.

There was no proof of abuse or neglect. The case for the petitioner was focused, as the appellant alleges, almost entirely on the issue of whether Tamra had complied with the plan of care.

*Dr. Lynn Robertson* is a psychologist. He first saw Tamra in February 1997 and thereafter on six occasions, focusing on her parenting skills, discipline, and communications. He described her as having grandiose plans and ideas.

*Joel Player* is employed by the Tennessee Department of Children's Services. He was Tamra's case worker from November 1992 until November 1996, and Katelyn's case worker from birth until November 1996. He testified to Tamra's early years when she first came into foster care at age 14, her disruptive nature, her pregnancy and placement in the Florence Crittenden Home in Knoxville, and her refusal to accept personal responsibility.

5

*Trisha Hartman* is employed as a counselor with the American Family Institute in Chattanooga, which provided therapeutic foster care for Tamra. She testified that Tamra, then 17, had numerous problems with the personal care of Katelyn, but that Tamra is an "absolutely intelligent person."

*Kimberly Reeder* was the foster parent of Tamra for about two years, engaged by the American Family Institute. Katelyn was three months old; Tamra was 17. She testified that Tamra did not always see to the needs of her child, did not always feed her when hungry, and would become angry when reproached about such neglect. Tamra refused to cook, and refused to learn to cook, stating that there was a "McDonald's on every corner" where Katelyn [3 months old] could eat. Tamra refused to cooperate, and on occasion would "blow up" when asked to feed and diaper her baby.

*Jane Brock* is employed by Children's Services as a crisis intervention worker. She has known Tamra since July 1989, and was privy to the plan of care tailored for Tamra, whom she described as very intelligent. Tamra's lifestyle was unstable; she could not be located for two weeks when she called, saying that she had moved to Illinois. She returned to the Chattanooga area and obtained employment at Wal-Mart, in the Spring of 1997, working 40 hours weekly. She had a sometime live-in boyfriend whose treatment of Katelyn was borderline abusive. When asked about this, Tamra became defensive with the rejoinder that "I have a right to have a good time." She was neglectful of her daughter, sometimes uncaring, and when confronted about her actions, Tamra would be defensive, always blaming the State for her defensiveness. On one occasion, Ms. Brock visited Tamra when Katelyn was about 18 months old. She was playing in a cat box, with feces, and Tamra was unconcerned.

*Glen Brown* is a probation officer with the Hamilton County government. His testimony was not revealing.

*Lynn Lawrence* is a clinical home supervisor at American Family Institute. He was Tamra's initial case worker at the Institute, beginning in September 1995. He described Tamra as hot-headed, with decreasing episodes which he attributed to maturity. He did not believe that her outbursts of temper were an impediment to her having custody of Katelyn.

*Kenneth Hazel* is a case aide with the American Family Institute. He saw Tamra on a regular basis. He thought Tamra "did a good job trying to be a mother to her daughter."

*Loretta Quarcoo* is the human resources manager for the Institute, of which she is one of the founders. She followed Tamra's case closely. She said that Katelyn was very responsive to Tamra, who was nurturing and caring towards her daughter. She thought that Tamra followed the plan of care in a substantial way.

*Debbie Holder* is the personnel manager of Wal-Mart. She testified that Tamra was employed in April 1997, and remained on the job in Illinois. The records reflect that Tamra is a good cashier, making minimum wage, with medical coverage.

*Ann Richey* is a registered school nurse, employed at the Teen Learning Center in Chattanooga. She has known Tamra since 1995, and saw her, with Katelyn, on a daily basis during the 1995-96 school year. She was impressed with the way Tamra cared for her child, always prompt for inoculations and other similar health precautions. She believed that Tamra "definitely could take on the nurturing side toward her baby."

7

*Rita Waller* is employed by Hamilton County as a social worker for the pregnancy program. She met Tamra in the 1996 school year. She believed that Tamra's temper problems were derived from the fact that she had no control of what had happened to her. She found Tamra "to be a very good mom . . . loving and kind towards that baby."

*Carolyn Thomas* is Tamra's mother. She is a secretary at the University of Illinois in Springfield, married to Edward Thomas, a mechanic. Their combined income is about $90,000.00 yearly. Tamra lives with them. She extolled the relationship between her daughter and granddaughter.

*Dale Peterson* is the guardian ad litem for Katelyn. He testified that Tamra had a mature attitude towards her mixed-race child (African-American and Caucasian), and filed his report in evidence.

*The Report of the Guardian Ad Litem.* His comments are noteworthy, and he believes Tamra's approach to the ancestry of her child is admirable - that the issue should simply be confronted and help Katelyn to understand that she should be proud of her ancestry.

Parents have a fundamental liberty interest in the care and custody of their children under both the United States and the Tennessee Constitutions. *Nash-Putnam v. McCloud,* 921 S.W.2d 170 (Tenn. 1996) (quoting *Stanley v. Illinois,* 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Hawk v. Hawk,* 855 S.W.2d 573 (Tenn. 1993). *In Re Adoption of Female Child (Bond v. McKentie),* 896 S.W.2d 546, 547 (Tenn. 1995); *Nale v. Robertson,* 871 S.W.2d 674, 678 (Tenn. 1994). Accordingly, Tenn. Const. art. I, § 3 and U.S. Const. amend. XIV afford parents faced with the possibility of losing their children with important due process rights. Specifically, these parents are entitled to a hearing on adequate notice. *Stanely v.*

*Illinois,* 405 U.S. at 649, and legal representation when the circumstances require it. *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 31-32, 101 S.Ct. 2153, 2162 (1981); *State ex rel. T.H. v. Min.,* 802 S.W.2d 625, 626 (Tenn. App. 1990).

The State's interest in protecting children must be tempered by a parent's constitutionally protected privacy interests in raising his or her children free from unwarranted governmental interference. Thus, a parent's rights may be terminated only when the continuation of the relationship between the parent and the child poses a substantial threat of harm to the child. *Petrosky v. Keene,* 898 S.W.2d 726, 728 (Tenn. 1995); *O'Daniel v. Messler,* 905 S.W.2d 182, 186 (Tenn. App. 1995). In order to warrant termination of their rights, a parent's conduct must be of the sort proscribed by Tenn. Code Ann. § 37-2-403(a)(2) (1991); *State v. Hines,* App. No. 88-54-II, slip. op. at 8-9 (Tenn. App., July 22, 1988), *perm. app. denied* (Tenn. Oct 17, 1988).

Because of the importance of the interests at stake in a termination proceeding, due process also requires the state to support its petition by clear and convincing evidence. *Santosky v. Kramer,* 455 U.S. 745, 747-48, 102 S.Ct. 1388, 1391-92 (1982); *State v. Smith,* 785 S.W.2d 336, 339 (Tenn. 1990). This heightened standard instructs the fact-finder concerning the degree of confidence that it must have in its conclusion and requires that there be no serious doubt concerning the correctness of the conclusions to be drawn from the evidence. *O'Daniel v. Messier,* 905 S.W.2d at 187-88.

There is little evidence that Tamra abandoned Katelyn within the purview of Tennessee law, T.C.A. § 36-1-102, *et seq.,* because the trial court took judicial notice of the fact that Tamra regularly visited and supported her child, and there was no evidence whatever of abuse or neglect. We think the evidence falls far

9

short of the clear and convincing standard of showing that Tamra did not substantially conform to the plan of care. It follows that the judgment is not supported by a preponderance of all the evidence. The judgment is accordingly reversed, with custody of Katelyn being awarded to Tamra pursuant to her counterclaim. Costs are assessed to the petitioner.

_____

CONCUR:

William H. Inman, Senior Judge

_____

Houston M. Goddard, Presiding Judge

_____

Herschel P. Franks, Judge